[Crim. No. 15021. Fourth Dist., Div. One. Sept. 28, 1983.]

THE PEOPLE, Plaintiff and Respondent v.
CHARLES LEE HAYS, SR., Defendant and Appellant.

COUNSEL

Quin Denvir, State Public Defender, under appointment by the Court of Appeal, Charles M. Sevilla, Chief Deputy State Public Defender, and Lewis A. Wenzell for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Daniel J. Kremer, Assistant Attorney General, A. Wells Petersen, Jay M. Bloom, John W. Carney and Richard D. Hendlin, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**STANIFORTH, Acting P. J.**—Upon a second trial (the first ended in mistrial) the jury convicted defendant Charles Lee Hays, Sr., of robbery (Pen. Code, § 211)[1] and assault with a deadly weapon (§ 245, subd. (a)). The jury also found Hays used a firearm (§ 12022.5) in the commission of these offenses. The jury convicted Hays of possession of a sawed-off rifle (§ 12020, subd. (a)) but found him not guilty of removing the serial numbers from the firearm. Hays was sentenced to the upper term (five years) for robbery, plus two years for firearm use plus a subordinate consecutive sentence of one year for assault, plus eight months for unlawful possession of the sawed-off rifle. Hays was also sentenced to three additional one-year terms because of three prior felony convictions. (§ 667.5, subd. (b).) His total sentence was 11 years, 8 months.

FACTS

At about 8 a.m. Marsha Pederson, bookkeeper of the Sav-On drug store in Escondido, was in her office on the second story of a commercial building. Her office contained two safes which were set by a time clock to open

---

[1]All statutory references are to the Penal Code unless otherwise specified.

shortly after 8 a.m. Her manager, Virgil Naveau, had just left when Pederson heard the ceiling above her giving way. She saw a person come crashing through the acoustical ceiling of her office. Before the man dropped out of the ceiling she heard no sounds on the roof. A rifle was slung across the man's chest. Pederson described the invader as a male with his face covered with mask or facial hair. He was wearing a green sweater-like garment with cream colored pants and dark stocking knit cap. This sweater was a similar shade of green to the sweatshirt later found in the Builder's Emporium (next door) where Hays was captured. Pederson testified the rifle on the man's chest was similar to a sawed-off M1 carbine wrapped inside the green sweatshirt. The man did not point a gun at her, yet Pederson felt she was threatened and was afraid. She screamed and ran out of her office and quickly down the stairs. She thought a robbery was taking place and did not want to participate. She saw the man for about five to ten seconds. Pederson was fleeing down the stairs leading to the main floor when she heard a sound she thought to be that of a person landing in her office. She reported this to Mary Tanksley and advised her not to go upstairs as someone had a gun. Pederson did not see any footprints on her desk when she returned to her office that day.

Tanksley looked into Pederson's office from about 14 feet distance. She saw a man standing in the office wearing a green shirt or sweater covering from neck to hips. The man was taking something off Pederson's desk. Tanksley could see two or three inches of the barrel and part of the stock of a rifle the man had strapped over his shoulders. The rifle (or portion) she saw looked very similar to that later recovered shortly thereafter by police at the Builders Emporium. She did not see any red tape on the gun. She saw the man for about five seconds. She did not see anyone else in the office. Tanksley went to the back of the store where she heard one set of footsteps running across the roof of the building in a northerly direction—towards the Builders Emporium located in the same shopping complex as the Sav-On drug store.

Manager Naveau climbed up the ladder to the roof and unlocked the padlocked hatch when he heard steps. As the better part of caution, Naveau decided to call the police and report the crime. He climbed down, asked a Von's employee to call the police. When returning to Sav-On Naveau saw truck driver Art Smart with his hands raised in the air looking up at the 40-foot high roof. On top of the roof about 100 feet away Naveau saw a man. He held a rifle to his shoulder pointed at Smart. The man ordered Smart to move. Smart said he had a bad leg and could not go any faster. Naveau was of the opinion the rifle held by the man was similar to the rifle the police found near Hays. Naveau could not identify the man on the roof

by either race or clothes. Naveau observed this armed confrontation with Smart for about five seconds.

Naveau then saw a second man wearing a heavy dark green jacket run out from the cul-de-sac on the ground level at the rear of the Sav-On store. He was carrying a blue dufflebag. The man jumped over the low wall, ran across the divided center of the city parkway, stripped off his jacket and ran into a parking lot. The running man was wearing a bright yellow shirt beneath the green jacket.

Barry White also witnessed Art Smart's encounter with the roof rifleman. White could not recall the person's race but said the man was of slight build, similar to that of defendant Hays. White also said the rifle he saw was approximately the same size as the rifle recovered. White saw a green jacketed man running from the back of the Sav-On building carrying a blue dufflebag. He saw him abandon the bright green jacket, saw the brilliant yellow shirt underneath. White directed the police in pursuit of the man. They captured him. He was Mark Hays, son of defendant Charles Hays, Sr. The son was of muscular build, larger than his father. The dufflebag contained the money taken from Sav-On.

The Builders Emporium manager heard sounds of someone walking or running on the roof and called the police. Aided by dog teams, they immediately searched the building and after an eight-minute search found Hays in the stockroom crouched upon boxes approximately 12 feet off the ground. There was a screwdriver and a comb on top of a box near him. Hays had a white powdery substance in his hair as well as on his face. This powder was similar to the white powdery substance on top of the desk in Pederson's office which fell from the ceiling when the robber(s) descended through the hole in the ceiling. There was no powder in the area around Hays where he was captured.

Hays was a black man with no beard. He was wearing a white T-shirt and blue Levis. The Builders Emporium stockroom was close by, readily accessible from a hole in Sav-On's roof. Near Hays' hiding place, obscured by pallets, was a sawed-off M1 carbine rifle with red tape on the top half. The rifle was wrapped in a green sweatshirt. The red tape on the rifle appeared to be from the same roll of red tape found near the hole on the Sav-On's roof. Officer Best could jog in a northerly direction from the hole on the roof of Sav-On to the open ceiling above the garden shop of Builders Emporium in 85 seconds. Access to Builders Emporium was available from the roof with about a 15-foot drop from the roof to a stack of pallets of peat moss in the garden area. On top of one of the bags of peat moss a red ski cap was found.

Two footprints were found on the top of Pederson's desk. Expert witness Bass testified the footprint in the powder on the desk had a tennis shoe "Z" pattern similar to the pattern on Hays' tennis shoes. He said Hays' shoes could have left the impression. They were the same width as the footprint. The patterns left by the shoes were not inconsistent with those of Hays' shoes. The son's—Mark Hays'—shoes, however, did not have a "Z" pattern but was a round type in the form of a "W." Hays' own witness—forensic scientist Wahley—testified to the same conclusions about the tennis shoes. Hays' witness also testified there was a black substance on the heel of Hays shoes which was similar to the tar, consistent with the tar paper, exposed in the cut in the roof over Sav-On's office.

## DISCUSSION

### I

■ Hays contends his robbery conviction should be reversed upon the ground of insufficiency of the evidence a larceny was accompanied by an assault. Hays misunderstands the legal prerequisites to the crime of robbery. Section 211 defines robbery as the felonious taking of personal property in the possession of another from his or her person or immediate presence and against his or her will accomplished by means of force *or* fear. There is no need to prove both force *and* fear. The Supreme Court recently said in *People* v. *Green* (1980) 27 Cal.3d 1, 54 [164 Cal.Rptr. 1, 609 P.2d 468], robbery is but larceny aggravated by the use of *force or fear* to accomplish the taking of the property from the person or presence of the possessor. Evidence of the victim's fear for her own safety or that of her company's is sufficient to sustain a conviction. (*People* v. *DeGeorgio* (1960) 185 Cal.App.2d 413, 423 [8 Cal.Rptr. 295]; § 212; *People* v. *Renteria* (1964) 61 Cal.2d 497, 499 [39 Cal.Rptr. 213, 393 P.2d 413].)

■ Hays next argues his conviction for robbery of Pederson must be reversed because he did not take property "from [her] person or immediate presence." The violent appearance of the armed robber forced Pederson to flee in fear for her safety, abandoning immediate bodily presence and control over her employer's personal property. She remained near enough to hear a second body arrive via the ceiling hole in the office. Thus, Hays' argument rests on the happenstance of a fear induced flight.

The term "immediate presence" is to be liberally construed. Any and all the sensory perceptions are included in determining "presence." (See *People* v. *Lavender* (1934) 137 Cal.App. 582, 585, 589-590 [31 P.2d 439]; *In re Alonzo C.* (1978) 87 Cal.App.3d 707, 712 [151 Cal.Rptr. 192]; *People* v. *Wiley* (1976) 57 Cal.App.3d 149, 160-161 [129 Cal.Rptr. 13]; *People* v.

*Hornes* (1959) 168 Cal.App.2d 314, 320 [335 P.2d 756]; *People* v. *Miramon* (1983) 140 Cal.App.3d 118, 124 [189 Cal.Rptr. 432].) The actual corporeal presence of the victim is not required. In *Lavender, supra,* the court held the robbery occurred in the victim's presence because the victim perceived, through hearing, the commission of the robbery. Important factors in the victim's perception were his or her ability to hear, see or smell "things that clearly indicate the commission of a robbery . . . ." (*Lavender, supra,* 137 Cal.App. at p. 590.)[2] Here, Pederson was as near as was safe to be with at least constructive control over the money in the safe. The fact the robber(s) forced her to flee does not breathe life into a claim the money in the safe was not taken from her immediate presence. (See *Lavender, supra,* at pp. 590-591; *Wiley, supra,* 57 Cal.App.3d at p. 161.) Pederson was "constructively" present during the taking. (*People* v. *Hornes, supra,* at pp. 320-321; see also 67 Am.Jur.2d Robbery, § 12, p. 37; 4 Wharton's Criminal Law (14th ed.) § 473, p. 52; *People* v. *Moore* (1968) 13 Mich.App. 320 [164 N.W.2d 423].)

Here there is more than substantial evidence (direct and circumstantial) to convince a reasonable trier of fact beyond any reasonable doubt (*People* v. *Johnson* (1980) 26 Cal.3d 557, 576 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255]) the person who descended through the roof into Pederson's immediate presence was Hays; he was armed with a rifle; his purpose was robbery and his presence was menacing. This show of force was sufficient to cause the intended victim to flee in fear. Personal property was carried away, possessed by the robbers, until retaken by the police from the captured Mark Hays. Beyond any reasonable doubt, the evidence proves personal property was taken pursuant to the robbers' (father and son) plan for breaking in through the roof, robbing and then departing either over the roof, escaping through to the nearby Builders Emporium or by the rear exit of Sav-On.

This plethora of evidence more than satisfies the statutory elements for robbery as well as the burden of proof requirements. To say the robbery was not accomplished by means of force or fear is to simply ignore the web of convicting facts.

## II

■ Hays next contends the trial court should have further explained or amplified the term "force or fear" as a requisite element of the robbery

---

[2]The *Lavender* court reasoned: "If a large herd of cattle that was scattered for a mile or more on a plain was in charge of a cowboy, who was located on a hill or knoll where he might watch the cattle, was the subject of a felonious asportation by thieves, who preparatory to their nefarious work, had 'held up' the cowboy, would it be contended that the crime was not committed in the 'immediate presence' of the cowboy, and consequently that it did not constitute a robbery?" (*Id.,* at p. 590.)

charged. Hays again urges a misconception—that force or fear are synonymous with a physical corporeal assault. Again, it is not necessary that robbery be accompanied by means of both force *and* fear. (*People* v. *Borra* (1932) 123 Cal.App. 482, 484 [11 P.2d 403]; *People* v. *Winters* (1958) 163 Cal.App.2d 619, 623 [329 P.2d 743].) The Supreme Court has held the terms force or fear do not require explanatory instructions. In *People* v. *Anderson* (1966) 64 Cal.2d 633, 640 [51 Cal.Rptr. 238, 414 P.2d 366], the court said: "The terms 'force' and 'fear' as used in the definition of the crime of robbery have no technical meaning peculiar to the law and must be presumed within the understanding of jurors." The jury was fully and properly instructed as to the elements of the crime of robbery. (CALJIC No. 9.10.)

### III

■ Hays argues it was error to allow Officer Bass to give his expert opinion regarding the similarity between Hays' tennis shoe and the footprints found in the powder on Pederson's desk. Hays failed to timely object in the trial court and therefore may not now, on appeal and for the first time, make this objection. (Evid. Code, § 353; *People* v. *Rogers* (1978) 21 Cal.3d 542, 548 [146 Cal.Rptr. 732, 579 P.2d 1048].) Nor was there objection to the introduction of the two photographs of the footprints or of the tennis shoes worn by Hays and his son, or to Bass' description of the evidence. The jury could have made its own comparison and reached the same conclusion. The challenge in the trial court was to Bass' qualifications as an expert witness. ■ ■ ■ ■ No similar argument is made on appeal.[3]

### IV

■ Hays next complains the evidence was insufficient to establish he *used* a firearm. Evidence from several witnesses point to Hays as the possessor of a sawed-off rifle.

---

[3]If the failure to object is ignored and the contention examined, it still lacks merit. What Hays seeks to do is detract from the weight of Bass' testimony, not attack its admissibility. Hays claims this case is "indistinguishable in principle" from *People* v. *Slone* (1978) 76 Cal.App.3d 611 [143 Cal.Rptr. 61]. In *Slone* defendant moved to strike the testimony of an expert witness who testified he found a stain containing blood in the defendant's car. The blood could not be identified as human blood and how long it had been in the car could not be established. The trial judge ruled the stain evidence relevant and admissible. The prosecutor then argued to the jury the stain was consistent not only with human blood but with the blood of the victim. This erroneous argument caused reversal.

In contrast, here there was no objection to footprint evidence, to Hays' shoes or Bass' comparison. The fact the footprints were in the white powdery substance similar to the white powder found in Hays' hair adds evidentiary weight to the opinion these footprints were his. Absolute certainty is not required before a conclusion of this nature is admissible. (*People* v. *Vernon* (1979) 89 Cal.App.3d 853 [152 Cal.Rptr. 765].) The weight to be attached to Bass' testimony was for the jury. The jury, as instructed by the court, was free either to accept or reject Bass' opinion.

Hays burst through the ceiling and landed on Ms. Pederson's desk. Pederson was alone in her office when Hays came crashing through the roof. She testified he had a rifle across his chest but could not remember whether he was actually touching it with his hands. During the entire time she observed him, he was suspended in the air. Tanksley, who saw Hays through a window to Pederson's office, testified Hays had the gun strapped over his shoulder. She did not observe him holding the gun nor did she testify that he either pointed the gun at her or threatened her with it. No witness places the rifle in his hands or his displaying it in a menacing manner. (See *People* v. *Colligan* (1979) 91 Cal.App.3d 846, 851 [154 Cal.Rptr. 389].)

Without doubt Hays was "armed" with, but did he personally "use" the rifle in the commission of the robbery as required by section 12022.5 before the extra penalty may be imposed?

■ The Supreme Court in *People* v. *Chambers* (1979) 7 Cal.3d 666, 672 [102 Cal.Rptr. 776, 498 P.2d 1024] held: "By employing the term 'uses' instead of 'while armed' the Legislature requires something more than merely being armed. [Citation.] One who is armed with a concealed weapon may have the potential to harm or threaten harm to the victim and those who might attempt to interrupt the commission of the crime or effect an arrest. [Citation.] Although the use of a firearm connotes something more than a bare potential for use, there need not be conduct which actually produces harm but only conduct which produces a fear of harm or force by means or display of a firearm in aiding the commission of one of the specified felonies. 'Use' means, among other things, 'to carry out a purpose or action by means of' to 'make instrumental to an end or process' and to 'apply to advantage.' (Webster's New Internat. Dict. (3d ed. 1961).) The obvious legislative intent to deter the use of firearms in the commission of the specified felonies requires that 'uses' be broadly construed."Application of this definition was easy in *Chambers* because the defendant pointed the gun at the victim and demanded money. A diligent research of the cases cited in *Chambers* demonstrates what facts and circumstances have guided the courts to find "use" as against "armed" and point to the parameters of a workable definition. *Chambers* cites *People* v. *Washington* (1971) 17 Cal.App.3d 470 [94 Cal.Rptr. 882]; *People* v. *Pheaster* (1963) 215 Cal.App.2d 754 [30 Cal.Rptr. 363]; *United States* v. *Wilson* (E.D. Pa. 1830) 28 F.Cas. 699; *People* v. *Southack* (1952) 39 Cal.2d 578 [248 P.2d 12]; and *People* v. *Alotis* (1964) 60 Cal.2d 698 [36 Cal.Rptr. 443, 388 P.2d 675].

In *Washington* the defendant was found guilty of robbery while armed with a deadly weapon. Justice Fleming vacated the judgment and remanded with directions to the trial court to find specifically whether defendant was

armed or whether he used the weapon. Justice Roth concurred; Justice Herndon concurred but found as a matter of law the record showed sufficient facts to support a use enhancement. According to the victim, the defendant walked up to her, stuck a gun in her side, said "I mean this is it. This is it. I mean it's not no plaything. This is it. Hand over everything you have", grabbed her purse and ran away. (17 Cal.App.3d at p. 475.) She also testified a shot was fired in her direction. A host of cases support Justice Herndon's view that these facts, if found to be true, would clearly constitute "use" within section 12022.5.

In *Pheaster* the defendant was found guilty of abortion with a finding he was "armed" with a .38-caliber revolver at the time of its commission. The court held "armed" means possession with the intent to use the weapon as a means of offense or defense. The defendant was about to perform an abortion on an undercover police officer when officers in the adjoining room entered. Defendant said he began carrying a gun because he was being followed, he was being "set up by the police" and he intended to use it "to shoot it out" with anyone who tried to " 'pull' " him " 'over to the side of the road.' " (215 Cal.App.2d at p. 1760.) The defendant's intent to use the weapon was clear but due to the quick action of the police he did not have the opportunity.

*Southack* holds pointing a gun at the intended victim constituted a "use" in a conviction for manslaughter.

In *Alotis* the defendant went to a motel room armed with a revolver to have an argument with her lover. The shots for which she was convicted of assault with the intent to commit murder were fired during this discussion. The issue was whether probation was permitted after a finding she used a deadly weapon. Defense psychiatrists testified defendant's firing the gun was not a volitional act because of her mental state and she fired unconsciously. The court concluded Penal Code language "used a deadly weapon" excluded a nonvolitional act for the purpose of preventing probation.

Supreme Court cases after *Chambers* include *People* v. *Najera* (1972) 8 Cal.3d 504 [105 Cal.Rptr. 345, 503 P.2d 1353], where the jury found the defendant guilty of robbery and armed with a gun at the time the robbery occurred. The defendant held a gun on the victim during the robbery, but the information did not charge defendant with a use enhancement under 12022.5. The information only charged defendant was armed under 12022. The *Najera* court found defendant has a right to have the use enhancement determined by a jury.

The court in *In re Culbreth* (1976) 17 Cal.3d 330 [130 Cal.Rptr. 719, 551 P.2d 23], found a use enhancement applicable only once even though

there were separate shots fired at several victims. *Culbreth* is not helpful in defining the boundary between armed and use enhancements. There was a clear use. Culbreth actually shot and killed the victims.

■ A use enhancement does not apply derivatively to a defendant who robs a victim while the codefendant holds the victim at gunpoint. (*People* v. *Walker* (1976) 18 Cal.3d 232 [133 Cal.Rptr. 520, 555 P.2d 306].)

The Supreme Court ordered, in *People* v. *Cole* (1982) 31 Cal.3d 568 [183 Cal.Rptr. 350, 645 P.2d 1182], a use enhancement stricken and remanded for resentencing. The court held the Legislature intended an additional penalty for great bodily injury only on the person who performed the act, who directly inflicted the injury, therefore, the defendant could not receive an enhanced sentence because although he directed the attack he did not physically strike the victim. The opinion explains the progressively enhanced sentences under section 12022. Section 12022 presents a gradation of culpability beginning with any person who is armed (§ 12022, subd. (a)) through any person who personally uses (§ 12022.5) to any person who personally inflicts great bodily injury (§ 12022.7). *Cole* does not help in determining what facts apply to what category of enhancement although the inference is the culpable acts could be grouped into three categories: facts showing the defendant had a weapon in his possession during the crime; facts showing the defendant actually threatened to use the weapon in an act of offense or defense; and facts showing the defendant intended to and did inflict injury with the weapon.

In the appellate courts, the following post-*Chambers* cases distinguish "armed" from "use": In *People* v. *Hayden* (1973) 30 Cal.App.3d 446 [106 Cal.Rptr. 348], the defendant was accused of robbery with two enhancements, one for being armed and the other for use. The court found the defendant was both armed with and used the gun. The three victims testified the robber pointed and threatened them with a gun.

The defendant in *People* v. *Provencher* (1973) 33 Cal.App.3d 546 [108 Cal.Rptr. 792], actually aimed and discharged the gun. The court affirmed conviction for assault with intent to commit murder but modified the judgment from use of a firearm to armed with a firearm because assault with the intent to murder was not one of the specifically enumerated crimes in the use enhancement section as it then read. However, because the jury found the defendant actually used a firearm and the *armed* enhancement section of the statute was not similarly specifically limited, the court directed modification of the judgment from a "use" to an "armed" finding.

*People* v. *Johnson* (1974) 38 Cal.App.3d 1 [112 Cal.Rptr. 834], involved a defendant who pointed a gun during a robbery at several victims. The

court said "A weapon is *used* within the meaning of section 12022.5 not only when it is fired, but when it is pointed at a victim to enforce a demand." (*Id.*, at p. 12.)

*People* v. *Reaves* (1974) 42 Cal.App.3d 852 [117 Cal.Rptr. 163], found a use enhancement proper following CALJIC No. 17.19 "display of a gun in a menacing manner" where the defendant forced the robbery victim to give up the money at gunpoint.

The defendant in *People* v. *Donnell* (1975) 52 Cal.App.3d 762 [125 Cal.Rptr. 310], entered a bank holding a shotgun and yelled " 'This is it. Everyone to the floor.' " (*Id.*, at p. 776.) The court found use enhancement proper because the display of the shotgun in the hands of the defendant produced a fear of harm or force in the minds of the victims.

*People* v. *Elliott* (1977) 70 Cal.App.3d 984 [125 Cal.Rptr. 310], was a conviction for first degree burglary with an armed enhancement. The robbery was committed while the defendant had a hunting knife encased in a holster but did not threaten the victim or use the knife. The court said the armed enhancement applied to a simple possession of the weapon.

In *People* v. *Williams* (1977) 75 Cal.App.3d 731 [142 Cal.Rptr. 704], the court affirmed a use enhancement where the appellant was struggling with the victim. Both the appellant and the victim had their hands on the gun when the appellant's sister ran in and shot the victim.

In *People* v. *Colligan, supra*, 91 Cal.App.3d 846, defendant while robbing the victim displayed the gun by opening his shirt with a statement he had a gun but did not want to use it. The appeal court held this constituted a menacing display of a firearm in the commission of a robbery. It caused the victim "to be frightened for her life and safety and to comply with his demands." (*Id.*, at p. 851.) Therefore it was a use.

The court in *People* v. *Jackson* (1979) 92 Cal.App.3d 899 [155 Cal.Rptr. 305], a conviction for robbery with firearm use, found the use enhancement proper even if the evidence proved the gun was inoperable because the defendant pointed the gun at the robbery victim when he demanded the money. A concurrence by Justice Kaus stated whether the weapon could fire or not was immaterial. The same panel wrote *People* v. *Rutkowsky* (1975) 53 Cal.App.3d 1069 [126 Cal.Rptr. 104], a conviction for first degree murder with a use enhancement. There was no concern over the validity of the use enhancement because "defendant blasted the victim in the face with a shot from a 12-gauge sawed-off shotgun." (*Id.*, at p. 1071.)

In *People* v. *Smith* (1980) 101 Cal.App.3d 964 [161 Cal.Rptr. 787], the court affirmed conviction for robbery with a use enhancement. The prosecution relied on appellant's cocking the gun to support the use finding.

In *People* v. *Box* (1982) 134 Cal.App.3d 841 [184 Cal.Rptr. 843], the defendant appealed after a first degree murder conviction with a firearm use enhancement. The appeal dealt with the exercise of peremptory challenges, however, it is clear the use enhancement was proper since the defendant shot and killed the victim.

In *People* v. *Read* (1983) 142 Cal.App.3d 900 [191 Cal.Rptr. 305], an involuntary manslaughter conviction followed a barroom brawl in which, while brandishing a shotgun, the defendant shot and killed the victim. The dissent would have stricken the use enhancement because brandishing the shotgun was a necessarily included element for the involuntary manslaughter conviction and therefore could not be used separately to extend the sentence.

In summary, of the 14 cases finding use enhancement proper, 12 of them show the defendant aimed, cocked, or fired the weapon. The 13th case (*Donnell*) found a use enhancement where the gun was in the hands of the defendant while he verbally threatened the robbery victims. The 14th use case (*Colligan*) did not involve touching the weapon but exposing it in a menacing fashion accompanied by words threatening a more violent use. Two other cases (*Najera* and *Provencher*) would on these facts clearly have been use cases because the defendants pointed the guns but were not use cases on the basis of pleading and statutory interpretation.

The four cases not finding a use enhancement involved (1) an unintentional discharge of the weapon, (2) mere possession only, (3) a codefendant's use, and (4) a holstered weapon.

Hays' acts are factually akin to the "armed" cases rather than the "use" cases. During the robbery Hays did not shoot or strike anyone with the rifle nor did he threaten to do so. Rather, he passively displayed the weapon. It hung across his chest as he came down into the office and was slung over his shoulder once he landed. The fact Pederson was frightened by his rifle does not compel a conclusion Hays used it. *People* v. *Nelums* (1982) 31 Cal.3d 355, 360 [182 Cal.Rptr. 515, 644 P.2d 201], upheld an "armed with" finding (§ 12022, subd. (a)) with respect to an inoperable weapon. The California Supreme Court reasoned: even a passive display of a firearm may engender a response in the victim but the fear of a potential use does not escalate an "armed with" status to a "use" punished by section 12022.5. Pederson too was frightened by the gun's presence, its potential

for use. However, under *People* v. *Chambers, supra,* 7 Cal.3d 666, 672, a bare potential for use will not support a use enhancement under section 12022.5. We conclude Hays was "armed with" the rifle during the robbery but there is no evidence to support a finding of "use." To hold otherwise would eliminate the distinction between "armed" and "use," a distinction the Legislature clearly intended to make. The two-year use enhancement added to the robbery term must be stricken.

## V

■ Hays next complains a *Yarber* instruction should have been given. (*People* v. *Yarber* (1979) 90 Cal.App.3d 895 [153 Cal.Rptr. 875].) CALJIC No. 3.01, given by the court, is a correct statement of the law regarding aiding and abetting.[4] A *Yarber* instruction may be required in certain factual circumstances. However, the evidence in this case does not warrant the *Yarber* instruction. This court as recently as *People* v. *Flores* (1982) 128 Cal.App.3d 512, 525 [180 Cal.Rptr. 368], refused to follow *Yarber* when the facts do not warrant the instruction. (Cf. *People* v. *Valenzuela,* hg. granted Cal. Supreme Ct. Crim. 22648, where the *Yarber* instruction was held not warranted.)

The evidence overwhelmingly supports the jury verdict Hays personally, together with his son, robbed Sav-On of substantial sums of money. There is no factual basis upon which to predicate his guilt on an aiding and abetting theory. His guilt rests upon proof of direct and active participation in the robbery as well as the assault with a deadly weapon.

## VI

Hays charges multiple sentencing errors. In connection with the robbery conviction (count one) the trial court imposed a two-year enhancement (§ 12022.5) for use of the firearm as found by the jury. In view of our determination (IV above) that the use finding was not supported by substantial evidence in the record, that enhancement must be stricken.

■ While the evidence does not support the finding of "*use*" of the rifle during the robbery, it overwhelmingly proves Hays was "*armed*" with a firearm in violation of section 12022, subdivision (a). Section 1181, subdivision 6 authorizes this court to modify a "finding" where the evidence

---

[4]The standard instructions (CALJIC Nos. 3.00 and 3.01) do not require the aider and abettor share in the criminal intent of the perpetrator. *Yarber* would require proof of this intent.

supports a "lesser degree" or "finding" but is insufficient to support the finding as to the greater degree of guilt.[5]

The purpose of section 1181, subdivision 6, is to obviate the necessity for a new trial where the court (including an appeal court) believes there is insufficient evidence to authorize a finding such as firearm use but more than sufficient to make a true finding as to the "narrower" allegation— "armed with" (*People* v. *Henderson* (1972) 26 Cal.App.3d 232, 237 [102 Cal.Rptr. 670]; *People* v. *Washington, supra,* 17 Cal.App.3d 470 (disapproved on other grounds *People* v. *Najera, supra,* 8 Cal.3d 504, 509, fn. 4); *People* v. *Strickland* (1974) 11 Cal.3d 946, 961 [114 Cal.Rptr. 632, 523 P.2d 672]; *People* v. *McClellan* (1980) 107 Cal.App.3d 297, 302 [165 Cal.Rptr. 603]).

Section 12022, subdivision (a), states: "Any person who is armed with a firearm in the commission of a felony shall . . . in addition and consecutive to the punishment prescribed for the felony . . . be punished by an additional term of one year, *unless such arming is an element of the offense* . . . . This additional term shall apply to any person who is a principal in the commission of a felony if one or more of the principals is armed with a firearm, whether or not such person is personally armed with a firearm." (Italics added.)

The section 12022, subdivision (a), sanction is applicable here and the one-year enhancement may be imposed by this court under section 1181, subdivision 6, authority unless "Such arming [was] an element of the offense."

Does the "armed" enhancement charge become "an element of the offense" of robbery? Several cases speak to and around this issue. The Supreme Court in *People* v. *Superior Court (Mendella)* (1983) 33 Cal.3d 754 [191 Cal.Rptr. 1, 661 P.2d 1081] (overruling *People* v. *Superior Court (Grilli)* (1978) 84 Cal.App.3d 506 [148 Cal.Rptr. 740]) declared both charged enhancements (§ 12022.7) and the principal "offenses" may be challenged by a pretrial section 995 motion. The *Mendella* decision, however, cannot be tortured to yield a rational sequitor the armed enhancement becomes an element of the underlying offense in the sentencing context.

---

[5]Section 1181, subdivision 6, provides: "When the verdict or finding is contrary to law or evidence, but if the evidence shows the defendant to be not guilty of the degree of the crime of which he was convicted, but guilty of a lesser degree thereof, or of a lesser crime included therein, the court may modify the verdict, finding or judgment accordingly without granting or ordering a new trial, and this power shall extend to any court to which the cause may be appealed." (See also § 1260.)

A second case touching the periphery of the issue here is *People* v. *McGreen* (1980) 107 Cal.App.3d 504 [166 Cal.Rptr. 360], which involved a charge of robbery with a section 12022.5 allegation. *McGreen* held, in response to an appellate charge of failure to instruct *sua sponte* on ADW, such failure was error but not reversible. *McGreen* was specifically overruled by *People* v. *Wolcott* (1983) 34 Cal.3d 92, 101 [192 Cal.Rptr. 748, 665 P.2d 520], which held the enhancement charge does not describe a new offense, " '[should not be] considered in determining . . . a lesser included offense." (*Id.*, at p. 101.)

The case at bench does not involve the availability pretrial of the section 995 motion to challenge the basis of a charged enhancement as in *Mendella, supra,* nor a claim *sua sponte* instructions for lesser included offenses were erroneously omitted as in *Wolcott, supra*. The issue is not the same, yet the reasoning of *Mendella* and *Wolcott* is inescapable.

Since the amendment of section 211a (Stats. 1976, ch. 1139, § 137.5, p. 5100, operative July 1, 1977) there has no longer been a crime of "armed" robbery or robbery in the first degree. There is now the crime of "robbery" as defined in section 211. If the robbery is committed by a robber who is either armed or uses a firearm in this commission, then an appropriate additional "enhancement" is to be imposed. (*People* v. *Read, supra,* 142 Cal.App.3d 900, 905.) The crime of robbery as now defined in section 211 does not include as an element any requirement the violator be "armed with" or "use" any particular weapon. Pursuant to the authority of section 1181.6 this court modifies the judgment by adding the one-year additional period of confinement to the robbery term.

## VII

The jury also found Hays "did use" the sawed-off rifle within the meaning of section 12022.5 in the commission of the assault with a deadly weapon on Art Smart. The court sentenced Hays to a consecutive one-year term for the assault with a deadly weapon but did not impose *any* enhancement based on the rifle use finding. The jury finding of use of the rifle in the assault with a deadly weapon on Art Smart is amply supported by substantial evidence. Hays pointed the gun at Art Smart and ordered him to move. This was a menacing display within the reasoning of *People* v. *Washington, supra,* 17 Cal.App.3d 470, 475. In view of the trial court's failure to sentence on the enhancement and this court's modification of certain of the sentences, the cause must be remanded for resentencing. Upon resentencing, the trial court is authorized to impose such an enhancement by the specific language of section 12022.5 "even" as here "where the use of

weapon is an element of the offense." (*People* v. *Read, supra,* 142 Cal.App.3d 900, 904.)

## VIII

 The court also imposed a consecutive eight-month sentence for possession of that same sawed-off firearm as a violation of section 12020, subdivision (a). Hays contends this constituted an unauthorized dual use of facts. We have stricken the two-year enhancement and imposed the one-year enhancement.

There was, however, more than a dual use of facts here involved. Section 654 provides in pertinent part: "An act or omission which is made punishable in different ways by different provisions of this code may be punished under either of such provisions, but in no case can it be punished under more than one; . . ." In *People* v. *Bradford* (1976) 17 Cal.3d 8, 22 [130 Cal.Rptr. 129, 549 P.2d 1225], the defendant contended: "[I]mposition of sentence upon both the assault with a deadly weapon upon a peace officer count (count III) and the possession of a concealable firearm by an ex-felon count (count VI) violated section 654 of the Penal Code." The Supreme Court reasoned: "The standard for applying section 654 in the circumstances of this case was restated in *People* v. *Venegas* (1970) 10 Cal.App.3d 814. . . . 'Whether a violation of section 12021, forbidding persons convicted of felonies from possessing firearms concealable upon the person, constitutes a divisible transaction from the offense in which he employs the weapon depends upon the facts and evidence of each individual case. Thus where the evidence shows a possession distinctly antecedent and separate from the primary offense, punishment on both crimes has been approved. On the other hand, where the evidence shows a possession only in conjunction with the primary offense, then punishment for the illegal possession of the firearm has been held to be improper where it is the lesser offense.' [Citation.]" (*Ibid.*) The Supreme Court concluded: "Defendant's possession of Officer Patrick's revolver was not 'antecedent and separate' from his use of the revolver in assaulting the officer." (*Ibid.*)

Imposition of sentence on Bradford for the lesser crime—ex-felon in possession of a gun, was prohibited by section 654.

Here there was no evidence of an antecedent possession of the sawed-off rifle. The evidence shows only a possession in conjunction with the primary (greater) offenses. The evidence does not show a possession at any other time or for any other purpose. (*People* v. *Jurado* (1972) 25 Cal.App.3d 1027, 1033 [102 Cal.Rptr. 498], and cases cited.) For this reason the sen-

tence imposed for the section 12020, subdivision (a), violation must be vacated.

Hays next contends the trial court erred in imposing the aggravated sentence on the robbery charge. In imposing the upper term of five years, the court listed five different circumstances in aggravation, including the threat of great bodily harm and the victim was particularly vulnerable. The court also referred to preplanning, sophistication and a great deal of professionalism in perpetration of the crime. The court noted Hays' previous convictions were numerous and serious. The court found no circumstances in mitigation. Each of the reasons set forth by the trial court as a basis for the aggravated sentence are supported by the evidence. The aggravated sentence was properly imposed.

Finally, Hays argues the court erred in imposing three separate one-year terms for the prior convictions. He inaptly relies on *People* v. *Cole* (1979) 94 Cal.App.3d 854 [155 Cal.Rptr. 892]. *People* v. *Cole* has been disapproved by the California Supreme Court. (*In re Kelly* (1983) 33 Cal.3d 267, 271-278 [188 Cal.Rptr. 447, 655 P.2d 1282].) The separate one-year terms were properly imposed.

The judgments of conviction are affirmed; the eight-month sentence imposed on count four is stricken. The two-year section 12022.5 enhancement on count one is stricken and in lieu thereof a one-year enhancement under section 12022, subdivision (a) imposed on count one. Because of the modification to the total sentence package the cause is remanded for resentencing only, conformable to and in consideration of the views expressed in this opinion. The court may not on resentencing impose a maximum sentence of more than 11 years, 8 months. (*People* v. *Collins* (1978) 21 Cal.3d 208, 216 [145 Cal.Rptr. 686, 577 P.2d 1026].)

Work, J., and Joseph, J.,* concurred.

A petition for a rehearing was denied October 11, 1983, and the petitions of both parties for a hearing by the Supreme Court were denied December 22, 1983.

---

*Assigned by the Chairperson of the Judicial Council.