Filed 9/26/13  P. v. Odom CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>DEISEAN MAURICE ODOM et al.,<br><br>    Defendants and Appellants. | B243402<br><br>(Los Angeles County<br>Super. Ct. No. BA391340) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Craig J. Mitchell, Judge.  Affirmed.

Linn Davis, under appointment by the Court of Appeal, for Defendant and Appellant Deisean Maurice Odom.

Raymond M. DiGuiseppe, under appointment by the Court of Appeal, for Defendant and Appellant Keara Enshelle Young.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Susan Sullivan Pithey, Supervising Deputy Attorney General, and Shawn McGahey Webb, Deputy Attorney General, for Plaintiff and Respondent.

————————————

Appellant Deisean Maurice Odom contends the trial court committed prejudicial instructional error when it modified the definition of "firearm use" in CALCRIM No. 3146. We find no error and affirm.

Appellant Keara Enshelle Young's case comes to us pursuant to *People v. Wende* (1979) 25 Cal.3d 436 (*Wende*). Young's counsel filed a brief raising no issues, and asked us to review the record. We invited Young to submit any contentions she wished us to consider, but we received no response. We have examined the record, found no arguable issues and affirm.

## PROCEDURAL BACKGROUND

Codefendants Odom and Young, were charged with attempted second degree robbery of Tristan Jones on November 28, 2011. (Pen. Code, §§ 664, 211;[1] count 1.) As to count 1 Odom was further charged with personal use of a firearm (§ 12022.53, subd. (b)). Young was also charged with second degree robberies of Crystal Coleman, on October 20, 2011, and of Crystal Brooks, on September 28, 2011. (§ 211; counts 2 and 3, respectively.) As to counts 1, 2, and 3, Young was further charged with a principal armed with a firearm (§ 12022, subd. (a)(1)). Odom was further charged with carrying a loaded handgun not registered to him. (§ 12031, subd. (a)(1); count 4.) Odom and Young pleaded not guilty and denied the allegations.

Odom and Young were tried by separate juries. Odom was found guilty as charged and his jury also found true the personal use of a firearm allegation. Odom was sentenced to a state prison sentence of 12 years computed as follows: The midterm of two years on count 1, attempted robbery, plus 10 years for the section 12022.53, subdivision (b)(1) enhancement, and two years for count 4, to run concurrently with the sentence for count 1.

Young was found guilty as charged on all 3 counts. Her jury found the principal armed allegations as to counts 1 and 2 true, but not true as to count 3. Young was

---

[1] Statutory references are to the Penal Code.

sentenced to six years in state prison as follows: three years on count 2 plus one year for the enhancement; eight months on count 1, plus four months for the enhancement; and one year on count 3. Odom and Young each filed timely notices of appeal.

## FACTUAL BACKGROUND

*Prosecution evidence*

1.       *Counts 1 and 4:  Attempted robbery of Tristan Jones*

On November 28, 2011 Jones was returning a movie to a Food 4 Less supermarket at the corner of Western and Slauson. As he walked toward the store, Jones noticed a gray car circling the parking lot. He saw the same car driving toward him when he left. The female driver, whom Jones later identified as Young, wore a red and blue baseball cap. A male, later identified as Odom, was in the passenger seat. As he walked to his car, Jones saw Odom get out.

As he got into his vehicle, Jones heard someone say something behind him. He got out and stepped towards Odom who repeatedly demanded that Jones "'[t]ake off [his] chain.'" When Jones refused, Odom said: "'Don't make me pull my thing out.'" Odom kept his hand in his pocket the entire time. But, after Jones twice refused to relinquish his jewelry, Odom partially removed his hand from his pocket, revealing three-to-four inches of what Jones recognized as the "butt end" of a semi-automatic gun.[2] Odom cursed at Jones and ran off.

Jones got into his car, called 911 and tried to follow Young and Odom. In the 911 tape played for the jury, Jones described the car and the man to the dispatcher and said the would-be robber had "brandished a firearm." Jones told the dispatcher Odom said, "'Don't make me pull out a thing,'" then "reached [in]to his pocket and that's when he turned around

---

[2] Jones recalled testifying at the preliminary hearing that he had seen the silhouette or the outline of a gun's butt. He did not say Odom had his hand in his pocket the entire time. He said he saw a gun's butt in Odom's pocket; he saw the silhouette outline of the gun clip. At trial, Jones said that he testified at the preliminary hearing that Odom reached into his pocket and acted as though he was clenching at something. The transcript of the preliminary hearing does not contain that testimony.

and took off running and got in the car and drove off." Jones said he was "guessing [Odom had] a gun." The dispatcher asked, "So you didn't see a gun?" Jones responded, "No, I did not see a gun, but he . . . ." The dispatcher interrupted Jones, saying, "He threatened as if he had a gun?" Jones responded, "Yes."

A Los Angeles Police Department (LAPD) vehicle and helicopter followed a silver four-door KIA driven by a female wearing a red baseball hat with a male passenger fitting the description in the crime broadcast. When the car was pulled over, the passenger got out and ran. An officer in the helicopter watched the man discard a gun as he fled. A semi-automatic handgun was recovered on the ground. The gun was loaded, with one live round in the chamber and seven rounds in the clip, and was registered to someone other than Odom. Young was taken into custody. License plates for Young's car were found in the trunk.

Officer Gregg Fischer interviewed Odom and Young separately at the station, after they waived their *Miranda*[3] rights. Neither interview was recorded as the station's audio and video equipment was out of order. Young provided written statements regarding the contents of her interview. Officer Fischer denied telling Young what to write in her statements, denied telling her she would be released if she confessed, and denied verbally accosting Young during the interview. He said Young cried after, but not during, the interview.

Odom told Officer Fischer he and Young had driven to get something to eat, when Young stopped her car and said, "'the boys are behind us, they have guns.'" Odom thought Young was referring to gang members, so he ran. He denied having been in possession of or throwing a gun.

Jones was also interviewed by Officer Fischer the day of the incident. Jones recalled telling the officers he saw Odom pull out a handgun half way out of his pocket. He told them it was a black, possibly semi-automatic, handgun.

---

[3] *Miranda v. Arizona* (1966) 384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694].

At the station, Young relayed the details of several incidents to Officer Fischer. She said she and Odom had been driving that day near Western and Slauson and saw an older black man on the sidewalk. Odom "checked" the man's pockets but took nothing because he saw a police car nearby. No police report was filed about this incident, about which Officer Fischer had not known until he interviewed Young.

After the incident with the older man, Young and Odom continued driving. They drove to the Food 4 Less store and saw Jones in the parking lot. Young stopped the car. Odom got out, spoke with Jones and "pulled out a gun." But, before taking anything from Jones, Odom ran back to Young's car because he was afraid a witness to the confrontation might identify him.

The third incident involved an October 20, 2011 robbery of Crystal Coleman. Young and Odom were driving near 42nd and Arlington and saw a woman (Coleman) standing on the sidewalk. Young parked the car and she and Odom approached Coleman. Young spoke to Coleman to distract her while Odom "approached, brandished a handgun and took [Coleman's] chain."

The final incident occurred on September 28, 2011 at a McDonald's on Crenshaw. Young said Odom got out of her car, approached Crystal Brooks and brandished a handgun. Young did not recall what, if anything, they stole. She and Odom sold the stolen property to a cash-for-gold business and the two of them split the proceeds.

2.    *Count 2: Robbery of Crystal Coleman*

On the afternoon of October 20, 2011, Coleman stood at a bus stop near 42nd Street and Arlington Avenue. A smoke gray car drove by several times; the occupants stared at her. The car parked and a girl, whom Coleman later identified as Young, got out of the car and stood on Coleman's right side. Coleman, an artist, complimented Young on tattoos on her left shoulder. Young complimented Coleman's purse. A man approached Coleman from behind, put a gun against her temple and told her not to move or he would "'blow [her] fucking head off.'" Coleman did not see the man's face because he wore a black hoodie. The man took Coleman's necklace and an earring, and Young took her other earring. Young and the man got back in the car and drove off. The

car did not have a license plate; it had paper tags with a red background and white and black writing.

3.      *Count 3:  Robbery of Crystal Brooks*

On September 28, 2011, Brooks was walking into a McDonald's near Crenshaw. She noticed a female, later identified as Young, in a grayish car.  The woman, who wore a red baseball cap, stared at Brooks.  The car pulled into the parking lot.  As Brooks approached the store's entrance, she saw the reflection in the glass of someone wearing a red hat and braids approaching her from behind.  Before she opened the door, Brooks felt what she believed was a gun behind her head.  She heard a female voice say, "'Don't move . . . , give me your . . . stuff.'"  Brooks relinquished some gold jewelry and "stuff." Afterwards, as Brooks ran down the street screaming for someone to call the police she saw the gray car again.  The car had no license plate, only white paper plates with red and black or blue print.

*Defense evidence*

Odom did not testify.

Young testified in her own defense.  She said she and Odom ran errands on November 28, 2011.  She dropped him off near the Food 4 Less store but did not see where he went.  Young did not know Odom tried to rob someone in the parking lot or that he had a gun.  She did not know why the police pursued her, and was never told.  An hour later, she was in a holding tank at the police station, where she was kept alone for 45 minutes and not allowed to call anyone.

Eventually, she was taken to an interrogation room and questioned by Officer Fischer and another officer.  Officer Fischer "seemed angry" and swore at Young.  She was "terrified," felt intimidated by the questioning, and cried the entire time.  Young first testified that this was the first time she had ever been accused of committing a crime.  Later, she

acknowledged having been arrested in early November 2011, on suspicion of having robbed someone of a gold chain.[4] She did not view this as an arrest because she was not charged.

Young testified that statements she prepared statements admitting involvement in the crimes at issue here were done at Officer Fischer's behest, and dictated by him. He told her she would be released if she wrote the statements, but would receive a five-year sentence if she refused. She believed him.

Young denied knowledge of the incident involving Jones, and denied knowledge of or involvement in the Coleman and Brooks robberies.

Young testified that her license plates were in the trunk of the car when she bought it in June or July of 2011. Initially, Young testified she did not put her license plates on the car because she lacked the proper tools. On cross-examination, she admitted she lied; the plates were on her car on October 6–7, 2011.

Young also testified that, when she was arrested in this case she had two purses and three wallets in her car. An I.D. card issued to Jasmine Labien was also found in her car. Young said Labien was a friend who left the card in her car. But Labien had filed a police report about her missing I.D.

## DISCUSSION

### I. *Odom's appeal*

### 1. *Relevant proceedings*

CALCRIM No. 3146 defines the elements of the firearm use as follows: "Someone *personally uses* a firearm if he or she intentionally does any of the following: [¶] 1. Displays the firearm in a menacing manner; [¶] 2. Hits someone with the firearm; [¶] OR [¶] 3. Fires the firearm." The trial court did not use this standard instruction. Instead, it replaced "[d]isplays the firearm in a menacing manner" in the standard instruction with the italicized language in the following instruction: "If you find Deisean Odom guilty of the crimes [sic]

---

[4] On November 7, 2011, Young was arrested for robbery. She was handcuffed, taken to the southwest station and interviewed in the interrogation room. A search of Young produced a small piece of gold chain.

7

charged in count 1, . . . you must then decide whether the People have proved the additional allegation that defendant personally used a firearm during the commission of that crime. . . . [¶] . . . [¶] *A firearm is personally used when a defendant deliberately shows a firearm or otherwise makes its presence known and there is no evidence to suggest any purpose other than intimidating the victim.* [¶] The People have the burden of proving each allegation beyond a reasonable doubt. If the People have not met this burden, you must find that the allegation has not been proved."

Odom maintains that the trial court committed reversible error by modifying the jury instruction regarding personal use of a firearm in such a way as to permit a true finding based on a legally incorrect theory. He insists the court's modification "erodes the implied legislative distinction between firearm 'use' under sections 12022.5 [subdivision] (a) and 12022.53 [subdivision] (b), and being 'armed with a firearm' in the commission of a felony." (See *People v. Granado* (1996) 49 Cal.App.4th 317, 324, fn. 7 (*Granado*).) He asserts such erosion occurred because the modified instruction permits mere presence of a firearm to constitute personal firearm use under sections 12022.5, subdivision (a) and 12022.53, subdivision (b). We disagree.

2.      *Standard of review*

We review de novo whether a jury instruction correctly states the law. (*People v. Posey* (2004) 32 Cal.4th 193, 218.) Our charge is to determine whether the trial court "'fully and fairly instructed on the applicable law.' [Citation.]" (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.) We look to the instructions as a whole and the entire record of trial, including the arguments of counsel, and consider whether there is a reasonable likelihood the jury misconstrued or misapplied the law. (*Ibid.*; *People v. Stone* (2008) 160 Cal.App.4th 323, 331; *People v. Kelly* (1992) 1 Cal.4th 495, 525.) "'Instructions should be interpreted, if possible, so as to support the judgment rather than defeat it if they are reasonably susceptible to such interpretation.' [Citation.]" (*Ramos*, at p. 1088.)

3.      *No forfeiture*

The Attorney General argues Odom forfeited his appellate challenge by failing to object to or seek a modification of the instruction at trial.

"A party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying instruction." (*People v. Lang* (1989) 49 Cal.3d 991, 1024; *People v. Campos* (2007) 156 Cal.App.4th 1228, 1236.) But no forfeiture will be found where "the instructional error affected the defendant's substantial rights." (*People v. Franco* (2009) 180 Cal.App.4th 713, 719; § 1259 ["appellate court may . . . review any instruction given, . . . even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby"].) Instructional error as to the elements of an offense or an enhancement affect the substantial rights of a defendant and are not waived by trial counsel's failure to object. (*People v. Hillhouse* (2002) 27 Cal.4th 469, 503; *People v. Flood* (1998) 18 Cal.4th 470, 482, fn. 7.) Odom argues his substantial rights were affected by the alleged instructional error as to the personal use enhancement. He has not forfeited the right to assert instructional error on appeal.

4. *The modified instruction accurately states the law*

In count 1, Odom was charged with attempted robbery of Jones. It was also alleged that during the commission of this offense he personally used a firearm within the meaning of section 12022.53, subdivision (b), which provides for a 10 year additional consecutive term for one who personally uses a firearm in the commission of an attempted robbery. (§ 12022.53, subd. (a)(4) & (18).)

There was no contention that Odom hit Jones with a firearm or fired a weapon. The trial court deleted those portions of the CALCRIM No. 3146 and, relying on language drawn from *Granado*, *supra*, 49 Cal.App.4th 317, modified the "displays the weapon in a menacing manner" portion of the instruction to state, "deliberately shows a firearm or otherwise makes its presence known, and there is no evidence to suggest any purpose other than intimidating the victim."

Standard jury instructions are approved for use as the "official instructions for use in the state of California" after an exhaustive vetting process to insure accuracy, comprehensiveness, and comprehensibility. (Cal. Rules of Court, rule 2.1050(a).) Their use "is strongly encouraged," but not compelled if a trial judge believes "a different instruction

would more accurately state the law and be understood by jurors." (Cal. Rules of Court, rule 2.1050(e); *People v. Runnion* (1994) 30 Cal.App.4th 852, 858.) Rather, the court's duty is correctly to state the law, which it may satisfy using a modified instruction. (Cal. Rules of Court, rule 2.1050(e); *Runnion*, at p. 858.) "While modification of the standard instructions is always within the discretion of the trial court, for indeed such instructions are themselves optional within the discretion of the trial court, any modification in those instructions must conform with the applicable law." (*People v. Hannon* (1977) 19 Cal.3d 588, 597.) The court may modify a standard instruction to clarify statutory language, or to explain terms that might otherwise lead to confusion. (*People v. Freeman* (1994) 8 Cal.4th 450, 501–505; *People v. Dimitrov* (1995) 33 Cal.App.4th 18, 26.) The modification used here appropriately conformed to the facts of the case. It enhanced the jury's comprehension of the law and focused it on the pivotal issue at trial.

The language at issue in the modified instruction was drawn from *Granado*, *supra*, 49 Cal.App.4th 317. In *Granado*, the defendant and a cohort approached two men to demand money. The defendant's partner pulled out a machete, causing one victim to run with the machete wielder in pursuit. The defendant pulled a gun from his waistband without pointing it at anyone, and demanded money from the remaining victim. The defendant was convicted of attempted robbery of both victims and of personally using a firearm against both. (*Id*. at pp. 320–321.) He argued the evidence was insufficient to establish the use enhancements both because a mere display of the gun did not prove he had used it and, as there was no evidence the victim who had run away had even known a gun was present, no firearm could have been used against that victim. (*Id*. at p. 326.)

Rejecting the first contention, the *Granado* court observed that the personal gun use statutes are broadly construed in order to deter the increased risk of serious injury that accompanies any deployment of a gun during the commission of a crime. (*Granado*, *supra*, 49 Cal.App.4th at p. 322.) Although mere possession of a gun is not enough, if the defendant displays a gun or otherwise makes its presence known for the purpose of intimidating the victim or others in order to carry out the underlying crime, there is sufficient facilitative use of the weapon for purposes of the firearm use enhancements. (*Id*. at p. 325.)

The same reasoning led the court to reject the assertion that the second victim had to have seen defendant's gun-related conduct for the enhancement to apply. Firearm "use" is established if a defendant engages in gun-related conduct coupled with the intent that the gun-related action facilitated the commission of a crime. (*Granado*, *supra*, 49 Cal.App.4th at pp. 328–329.) The court found it is of no import that "the victim is not cowed, or turns to run before seeing the gun or realizing it is present," so long as there exists evidence allowing a juror to reasonably find that the defendant intended for his gun-related action to facilitate the commission of a crime. (*Ibid.*) Because the statute aims to make the would-be robber keep his gun in his waistband, once the gun has been deployed to further the crime, the enhancement applies: "To excuse the defendant from this consequence merely because the victim lacked actual knowledge of the gun's deployment would limit the statute's deterrent effect for little if any discernible reason. [Citation.]" (*Id*. at p. 327.) Thus, the only mental state required for a firearm use enhancement is defendant's intent to use the gun to facilitate the crime. (*Id*. at p. 328.)[5] A "use" finding does not require the victim to see the gun to constitute a facilitative "use." In *People v. Jacobs* (1987) 193 Cal.App.3d 375 (*Jacobs*), the defendant's words, "'I have a gun and don't want to use it'" followed by audibly cocking the gun in his pocket constituted "'use'" for a gun use enhancement under section 12022.5, subdivision (a).[6] (*Id*. at pp. 379–380.)

The trial court's modification, based on *Granado*, *supra*, 49 Cal.App.4th 317, is an appropriate clarification of CALCRIM No. 3146's definition of firearm use to conform to the facts of this case.

---

[5] *Granado*, *supra*, 49 Cal.App.4th 317 construed the personal use enhancement delineated in section 12022.5. The statute's terms have also been used to determine whether a defendant personally used a gun within the meaning of section 12022.53. (See, e.g., *People v. Mason* (2002) 96 Cal.App.4th 1, 12–14.)

[6] The question in *Jacobs*, *supra*, Cal.App.3d 375 was whether the defendant's conduct amounted to a menacing "display" of the gun. The court concluded it did, stating "a firearm is displayed when, by sensory perception, the victim is made aware of its presence." (*Id.* at p. 381.)

Odom argues that the modification allowed the jury to conclude that a gun's "mere 'presence'" or "known presence" alone is enough to find personal firearm use. But this argument ignores the portion of the *Granado* rule, which the trial court included in its modification, that requires that the weapon be shown or its presence made known for the sole purpose of intimidating the victim. (49 Cal.App.4th at p. 325.)

*People v. Hays* (1983) 147 Cal.App.3d 534 (*Hays*), on which Odom relies, does not support his position. In *Hays*, the defendant, with a sawed-off rifle strapped to his shoulders, crashed through the ceiling of a drugstore he planned to rob. (*Id*. at p. 539.) The gun was in full view of two store employees while the defendant committed the underlying crime. (*Ibid*.) But there was no evidence the defendant ever handled the rifle, let alone "display[ed] it in a menacing manner." (*Id*. at p. 544.) The *Hays* court struck the use enhancement because the defendant only "passively displayed" the rifle. (*Id*. at pp. 548–549.)

*Alvarado v. Superior Court* (2007) 146 Cal.App.4th 993 (*Alvarado*), reached a similar conclusion. In *Alvarado*, the defendant went into a convenience store, claiming to be on a suicide mission, and ordered an employee to call the police. After calling the police, the employee noticed a shotgun on a shelf near the defendant. (*Id*. at pp. 997–998.) The gun remained in the same spot, untouched until retrieved by police after the defendant's arrest. As in *Hays*, *supra*, 147 Cal.App.3d 534, there was no evidence the defendant had brandished or displayed the shotgun in a menacing manner, and no victim or witness had seen him hold the shotgun or even draw attention to its presence. As in *Hays*, the court found no gun-related conduct beyond passive exposure of the gun, a circumstance under which a personal use enhancement could not stand. (*Alvarado*, at p. 1005.)

*Hays*, *supra*, 147 Cal.App.3d 534, *Alvarado*, *supra*, 146 Cal.App.4th 993 and *Granado*, *supra*, Cal.App.4th 317 make clear that the dividing line between "use" and "armed" is determined by whether the defendant's gun-related conduct constitutes an affirmative act in furtherance of a crime or is merely a passive or inadvertent exposure of the gun. "The litmus test for the distinction [between use and armed] is functional: did the defendant take some *action* with the gun *in furtherance of the commission* of the crime? If so the gun was 'used,' and the more severe penalty . . . applies. If, on the other hand, the

defendant engaged in no weapons-related conduct, or such conduct was incidental and unrelated to the offense, no 'use' occurred, and only the lesser enhancement . . . applies." (*Granado*, at p. 324, fn. 7.)

This interpretation aligns with the California Supreme Court's mandate that "use" be given an expansive construction. (*People v. Chambers* (1972) 7 Cal.3d 666, 672.) In comparing the terms "'use'" and "'armed,'" the court explained that the "obvious legislative intent to deter the use of firearms in the commission of the specified felonies requires that 'uses' be broadly construed." (*Ibid.*) "Although the use of a firearm connotes something more than a bare potential for use, there need not be conduct which actually produces harm but only conduct which produces a fear of harm or force by means or display of a firearm in aiding the commission of one of the specified felonies. 'Use' means, among other things, 'to carry out a purpose or action by means of,' to 'make instrumental to an end or process,' and to 'apply to advantage.' [Citation.]" (*Ibid.*) "Thus when a defendant deliberately shows a gun, or otherwise makes its presence known, and there is no evidence to suggest any purpose other than intimidating the victim (or others) so as to successfully complete the underlying offense, the jury is entitled to find a facilitative use rather than an incidental or inadvertent exposure." (*Granado*, *supra*, 49 Cal.App.4th at p. 325.) *Granado* clarified the definition of firearm use. The modified instruction correctly states the law.

Nor is there any reasonable likelihood the jury misconstrued the law when they found Odom personally used a firearm. These facts do not resemble the circumstances involved in *Hays*, *supra*, 147 Cal.App.3d 534 and *Alvarado*, *supra*, 146 Cal.App.4th 993, where there was only a passive weapons display and no gun-related conduct to speak of. Here, Jones saw Odom clenching something in his pocket throughout the men's entire confrontation. When Jones refused to surrender his jewelry despite Odom's repeated demands, Odom then resorted to threatening Jones, telling him not to "'make me pull my thing out,'" while simultaneously revealing several inches of a handgun. In addition to Jones's testimony, evidence that Odom personally used a gun to facilitate the failed robbery was presented in the 911 recording, and police officer's recitation of what Jones said on the day of the crime,

and Young's revelation to the LAPD that Odom had pulled out a gun during the attempted robbery of Jones.

We also reject Odom's assertion that the prosecutor contributed to the error by blurring the distinction between "use" and "armed" in her closing argument. The prosecutor stated the law, and explained the distinction between "personal use" and principal "armed" when she told jurors: "It doesn't matter if [Odom] pulled [the gun] all the way[,]. . . pulled it out an inch or two, or if he kept it in his pocket the whole time. [¶] What matters is that [Odom] made [the gun's] presence known. That he either showed it, or . . . otherwise made its presence known to intimidate. [¶] And, of course, [Odom] took it out to show the victim. Because he said, 'Don't make me pull out my thing.' And the only reason he did that is to intimidate them into giving their property. [¶] . . . [¶] . . . "If [Odom] had never brought Mr. Jones' attention to the gun or had never used it to intimidate Mr. Jones, then it would have only been principal armed. [¶] But here because . . . [Odom] used it to threaten Mr. Jones, because he made Mr. Jones aware of the fact that he had a gun, for Mr. Odom it's personal use [as to count 1] and principal armed [count 4]."

The prosecutor's argument was proper and drawn directly from the modified instruction and *Granado*, *supra*, Cal.App.4th 317. There is no support for Odom's assertion that the prosecutor told jurors the use enhancement was satisfied because "a gun was present, . . . therefore, there was use . . . ."

The jury was presented with the facts, including Jones's several recitations of what transpired during the attempted robbery. Factual discrepancies, which the jury resolves, do not constitute different legal theories. The prosecution's theory remained steadfast throughout trial: Odom displayed the gun to Jones, or at least made its presence known to him, and the purpose for doing so was to intimidate Jones in order to facilitate a robbery. There were some evidentiary discrepancies as to whether Odom's gun was actually displayed. The jury considered this evidence and rejected Odom's contention that he had merely been armed. Jones became aware that Odom had a gun either when he saw the outline in the pocket in which he kept his hand, or when he partially pulled it from his pants exposing several inches of its gun's "butt," either of which occurred within the context of

14

Odom's threatening behavior. Whether or not Jones actually saw the gun that Odom concedes was present, there can be no question that Odom's conduct amounted to a "menacing display" of the gun in order to facilitate a robbery. The use enhancement was properly imposed.

## II. *Young's appeal*

We appointed counsel to represent Young on appeal. After examination of the record, Young's counsel filed an opening brief raising no issues, and asking this court to independently review the record. On April 19, 2013, we told Young that she had 30 days within which to personally submit any contentions or issues she wished us to consider. To date, we have received no response.

We have examined the entire record and are satisfied that Young's counsel fully complied with his responsibilities, and that no arguable issues exist. (*People v. Kelly* (2006) 40 Cal.4th 106, 109–110; *Wende*, *supra*, 25 Cal.3d at p. 441.)

**DISPOSITION**

The judgment is affirmed.

NOT TO BE PUBLISHED.


JOHNSON, J.


We concur:


MALLANO, P. J.


CHANEY, J.