Filed 2/6/14  P. v. Roberts CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JEFFRI TYRONE ROBERTS,<br><br>    Defendant and Appellant. | E055303<br><br>(Super.Ct.No. SWF028031)<br><br>OPINION |

APPEAL from the Superior Court of Riverside County.  F. Paul Dickerson, Judge. Affirmed.

Renee Rich, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina, Ronald A. Jakob and Kimberley A. Donohue, Deputy Attorneys General, for Plaintiff and Respondent.

1

A jury found defendant and appellant Jeffri Tyrone Roberts guilty of two counts of robbery (Pen. Code, § 211; counts 1 & 2)[1] and one count of burglary (§ 459; count 3). The jury also found true that defendant personally used a deadly and dangerous weapon, to wit, a sledgehammer (§ 12022, subd. (b)(1)), in the commission of the robberies; and that defendant intentionally damaged and destroyed property of a value exceeding $65,000 (§ 12022.6, subd. (a)(1)). In a bifurcated proceeding, defendant admitted that he had suffered one prior serious felony conviction (§ 667, subd. (a)) and two prior serious and violent felony convictions (§§ 667, subds. (c) & (e)(2)(A), 1170.12, subd. (c)(2)(A)). As a result, defendant was sentenced to a total determinate term of five years and a total indeterminate term of 25 years to life in state prison with credit for time served. On appeal, defendant contends (1) the trial court prejudicially erred in admitting evidence of an uncharged robbery, and (2) there was insufficient evidence to support the jury's true finding that he personally used a weapon in the commission of the robberies. We reject these contentions and affirm the judgment.

I

FACTUAL BACKGROUND

Around 11:00 a.m. on December 7, 2008, defendant and his accomplice robbed a jewelry store at the Temecula Promenade Mall (the Temecula robbery). At the time, two

---

[1] All future statutory references are to the Penal Code unless otherwise stated.

female employees were working.[2]  Defendant, wearing a hooded sweatshirt, a red baseball cap and dark sunglasses, and carrying a dark-colored duffel bag, went to a display case containing the most valuable solitaire diamonds and pulled out a sledgehammer from the bag.

Meanwhile, defendant's accomplice stood in front of the two store employees, instructing them not to move.[3]  When a telephone rang, one of the employees turned her head to look at it, and defendant's accomplice ordered the employees to put their hands up.  The employees feared for their safety.

Defendant pounded the jewelry case with the sledgehammer.  Because the tempered glass on the case did not shatter with the first swing of the sledgehammer, defendant continued pounding the case until the glass gave in.  Defendant then grabbed the diamonds from the jewelry case and placed them in his bag.  Defendant and his accomplice thereafter ran out of the jewelry store toward a J.C. Penny store.

Christine and Robert McKay were in the mall parking lot near the J.C. Penny store when they saw two men run out of the mall, carrying something in their hands, and get into a gray Honda Accord with paper Norm Reeves license plates.  Mr. McKay described one of the men as Black, wearing jeans, a white hooded sweatshirt, and a red baseball cap; the other, a Mexican male.

---

[2]  A third employee was also working; however, she did not observe the incident because she was in the back of the store during the robbery.

[3]  Defendant's accomplice was identified at trial as Jason Lattier, and he is not a party to this appeal.

3

The robbery was captured on the jewelry store's surveillance cameras. The video of the incident was played for the jury. The two store employees were unable to identify defendant as the robber either in a photographic lineup or at trial. The total amount of the items taken from the jewelry store was $110,465.

Defendant was not apprehended at that time, and Riverside County Sheriff's Department Investigators began investigating the incident. During the course of the Temecula robbery investigation, Investigator Jeff Fisher received information from the Orange County Sheriff's Department (OCSD) that it was investigating a similar robbery (the Orange County robbery).

The Orange County robbery occurred on October 5, 2008, at a jewelry store located inside a Ritz-Carlton in Dana Point. During the Orange County robbery, defendant and his accomplice entered the jewelry store between 11:00 a.m. and noon. Defendant's accomplice, wearing a hat, dark sunglasses and gloves, and carrying a black bag, pulled out a gun, pointed it at one of the store employees, and said, "'You make one false move and I will shoot and kill you.'" Defendant's accomplice then ordered the employee to open the jewelry case and stated that he wanted all of the expensive jewelry. Defendant stood as a lookout, wearing sunglasses, a hat, and a hooded sweatshirt. When defendant noticed the store had security cameras, he pulled up the hood of his sweatshirt

and told his accomplice to hurry. After taking the jewelry, defendant and his accomplice ran out of the store and fled the scene in a Ford Mustang.**4**

After exhausting leads, OCSD investigators began investigating the getaway vehicle due to its unique color. After meeting with Ford executives, the investigators discovered that about 140 vehicles of that particular model were sent to rental car companies in California. A further investigation revealed that defendant had rented the type of vehicle used to flee the scene from the Orange County robbery. The investigators thereafter compared a Department of Motor Vehicle photograph of defendant to the store's surveillance video in the Orange County robbery and concluded it was highly probable defendant was one of the suspects who committed the crime.

OCSD thereafter conducted a surveillance of defendant from December 17 through 23, 2008. OCSD investigators observed defendant return a rental car on December 17, 2008, and get into a gray Honda Accord with paper Norm Reeves license plates. The car was being driven by defendant's accomplice, Lattier. Defendant and Lattier then drove to defendant's apartment complex in Irvine. After watching defendant's and Lattier's actions, OCSD investigators concluded that defendant and his accomplice were casing several jewelry stores in Southern California, looking for their next target, and obtaining information about the stores.

Specifically, investigators observed defendant and Lattier drive to the Westfield Mall in Carlsbad on December 18, and while defendant stayed in the car, Lattier got out

---

**4** In a separate criminal action, defendant and his accomplice pled guilty to the Orange County robbery.

5

of the vehicle, looked around the parking lot, and entered the mall where he went into several jewelry stores. After about 15 minutes, Lattier returned to the vehicle where defendant had been waiting. On December 20, defendant and Lattier drove to a jewelry store in the City of Orange, where Lattier entered the store for several minutes, and returned empty-handed to the waiting car. On December 21, defendant and Lattier returned to the Carlsbad Westfield Mall. Lattier exited the vehicle, followed a few minutes later by defendant. Lattier and defendant thereafter began casing one of the jewelry stores. After a few minutes, they both returned to defendant's vehicle and left. They then drove to the jewelry store in the City of Orange, but left after finding the store closed.

On December 22, defendant and Lattier again went to the jewelry store in the Carlsbad Westfield Mall. Lattier entered the mall first, followed by defendant. Approximately 10 minutes later, defendant and Lattier returned to the vehicle, opened the trunk of the vehicle, and changed clothing. Defendant grabbed a satchel. Lattier pulled out a handgun and placed it in his waistband. They then closed the trunk and returned to the mall. Once inside the mall, they moved their heads in a "swivel" motion—looking for security guards or other law enforcement personnel. Something "spooked" them, and they returned to the vehicle wearing sunglasses and baseball caps, despite the rain. They then drove home, taking a different route back to defendant's Irvine apartment, through Riverside County.

The following day, December 23, OCSD stopped defendant's vehicle based on their observations of defendant's and Lattier's actions on the previous day. A search of

6

the vehicle revealed evidence from the Temecula robbery, including a dark brown duffel bag, a sledgehammer, gloves, sunglasses, empty jewelry trays from the Temecula jewelry store, and a diamond ring.

Subsequently, OCSD provided Investigator Fisher with information concerning defendant's activities. Riverside County Sheriff's Department deputies presented photographs of defendant's vehicle to the McKays. The McKays confirmed that the gray Honda Accord with paper Norm Reeves license plates matched the vehicle they saw leaving the Temecula Promenade Mall parking lot. Mr. McKay identified defendant in a photographic lineup as one of the two men he saw fleeing the scene.

II

DISCUSSION

A.    *Admission of Prior Uncharged Robbery*

Defendant contends the trial court prejudicially erred in admitting evidence of the uncharged Orange County robbery under Evidence Code section 352.

1.    Procedural Background

The People moved in limine for admission of evidence that defendant committed and pled guilty to the Orange County robbery in October 2008. The People argued the evidence was admissible to prove intent, identity, and common plan or scheme. Defendant simultaneously moved to exclude the evidence on the grounds the prior robbery and charged robbery were not sufficiently similar and the evidence was more prejudicial than probative. Defendant also argued that introduction of his guilty plea to the Orange County robbery was more prejudicial than probative.

7

The trial court ruled the evidence was admissible to show intent and common plan or scheme. The court did not admit the evidence to show identity. The court also found that under Evidence Code section 352 the evidence was more probative than prejudicial. The court also allowed introduction of defendant's guilty plea to the Orange County robbery, noting that without the evidence of the guilty plea the court was "actually painting an incomplete picture for the jury."

### 2. Legal Principles

Character evidence in the form of prior uncharged offenses is inadmissible to prove criminal character or disposition. It is admissible to prove a material fact such as identity, common design or plan, or intent, however. (Evid. Code, § 1101, subds.(a), (b); *People v. Lenart* (2004) 32 Cal.4th 1107, 1123; *People v. Lewis* (2001) 25 Cal.4th 610, 636; *People v. Kipp* (1998) 18 Cal.4th 349, 369; *People v. Ewoldt* (1994) 7 Cal.4th 380, 393 (*Ewoldt*), superseded by statute on other grounds, as stated in *People v. Britt* (2002) 104 Cal.App.4th 500, 505.) To be admissible for this purpose, the charged and uncharged offenses must be sufficiently alike to support a rational inference of identity, common design or plan, or intent. (*Kipp*, at p. 369.) The actual degree of similarity required depends upon the material fact to be established.

The highest degree of similarity between charged and uncharged crimes is required to establish the uncharged crime's relevancy to prove identity. (*Ewoldt*, *supra*, 7 Cal.4th at p. 403.) "For identity to be established, the uncharged misconduct and the charged offense must share common features that are sufficiently distinctive so as to support the inference that the same person committed both acts. [Citation.] 'The pattern

8

and characteristics of the crimes must be so unusual and distinctive as to be like a signature.' [Citation.]" (*Ibid*.) A lesser degree of similarity is required to show intent than identity or common plan, because the recurrence of similar conduct tends to negate the possibility that it occurred by accident or inadvertence. (*Id*. at p. 402.)

A determination that uncharged crimes evidence is relevant under Evidence Code section 1101, subdivision (b), is not the end of the inquiry, however. "Evidence of uncharged offenses 'is so prejudicial that its admission requires extremely careful analysis. [Citations.]' [Citations.] 'Since "substantial prejudicial effect [is] inherent in [such] evidence," uncharged offenses are admissible only if they have substantial probative value.' [Citation.]" (*Ewoldt*, *supra*, 7 Cal.4th at p. 404, italics omitted.) Thus, to be admissible, uncharged crimes evidence that is relevant to prove identity, intent or common design or plan "'must not contravene other policies limiting admission, such as those contained in Evidence Code section 352.'" (*Ibid*.)

In *Ewoldt*, the Supreme Court explained, "Evidence of a common design or plan . . . is not used to prove the defendant's intent or identity but rather to prove that the defendant engaged in the conduct alleged to constitute the charged offense." (*Ewoldt*, *supra*, 7 Cal.4th at p. 394.) The *Ewoldt* court observed that the "distinction, between the use of evidence of uncharged acts to establish the existence of a common design or plan as opposed to the use of such evidence to prove intent or identity, is subtle but significant." (*Id*. at p. 394, fn. 2.)

"Evidence of a common design or plan is admissible to establish that the defendant committed the act alleged. Unlike evidence used to prove intent, where the act

9

is conceded or assumed, '[i]n proving design, the act is still undetermined. . . .' [Citations.] For example, in a prosecution for shoplifting in which it was conceded or assumed that the defendant was present at the scene of the alleged theft, evidence that the defendant had committed uncharged acts of shoplifting in a markedly similar manner to the charged offense might be admitted to demonstrate that he or she took the merchandise in the manner alleged by the prosecution.

"Evidence of identity is admissible where it is conceded or assumed that the charged offense was committed by someone, in order to prove that the defendant was the perpetrator. For example, in a prosecution for shoplifting in which it was conceded or assumed that a theft was committed by an unidentified person, evidence that the defendant had committed uncharged acts of shoplifting in the same unusual and distinctive manner as the charged offense might be admitted to establish that the defendant was the perpetrator of the charged offense. [Citation.]" (*Ewoldt*, *supra*, 7 Cal.4th at p. 394, fn. 2.)

The *Ewoldt* court further clarified that common scheme or plan evidence is generally inadmissible in cases involving crimes such as robbery, where the primary issue is whether the defendant was present at a particular location: "[I]n most prosecutions for crimes such as burglary and robbery, it is beyond dispute that the charged offense was committed by someone; the primary issue to be determined is whether the defendant was the perpetrator of that crime. Thus, in such circumstances, evidence that the defendant committed uncharged offenses that were sufficiently similar to the charged offense to demonstrate a common design or plan (but not sufficiently

10

distinctive to establish identity) ordinarily would be inadmissible. Although such evidence is relevant to demonstrate that, assuming the defendant was present at the scene of the crime, the defendant engaged in the conduct alleged to constitute the charged offense, if it is beyond dispute that the alleged crime occurred, such evidence would be merely cumulative and the prejudicial effect of the evidence of uncharged acts would outweigh its probative value." (*Ewoldt*, *supra*, 7 Cal.4th at p. 406.)

### 3.     Analysis

Defendant argues the trial court erred in admitting evidence of the uncharged robbery for the purposes of proving intent or common plan or scheme. We apply the abuse of discretion standard of review to this claim. (*People v. Lenart*, *supra*, 32 Cal.4th at p. 1123.)

In this case, defendant's presence at the December 2008 robbery at the Temecula jewelry store was far from assumed. On the contrary, defendant's identity as one of the perpetrators of the charged offenses was a central issue in the case. The uncharged offense evidence was offered to attempt to prove that defendant was present at the scene and that he participated in the charged robbery. We recognize the trial court erroneously concluded evidence of the prior offense was admissible to prove common scheme or plan since it was undisputed that the crime occurred. The evidence was also not admissible under Evidence Code section 1101 to show intent since the intent of the perpetrator was not at issue. However, the evidence was admissible to show the identity of the perpetrators.

Even though the trial court's reasons for admitting the evidence were erroneous, the ruling will not be disturbed on appeal since the evidence was admissible on other grounds. "'"[A] ruling or decision, itself correct in law, will not be disturbed on appeal merely because given for a wrong reason. If right upon any theory of the law applicable to the case, it must be sustained regardless of the considerations which may have moved the trial court to its conclusion." [Citation.]'" (*People v. Zapien* (1993) 4 Cal.4th 929, 976.)

The uncharged offense was sufficiently similar to the charged offense to establish identity of the perpetrator. "'Other-crimes evidence is admissible to prove the defendant's identity as the perpetrator of another alleged offense on the basis of similarity "when the marks common to the charged and uncharged offenses, considered singly or in combination, logically operate to set the charged and uncharged offenses apart from other crimes of the same general variety and, in so doing, tend to suggest that the perpetrator of the uncharged offenses was the perpetrator of the charged offenses." [Citation.] [Citation.] The inference of identity, moreover, need not depend on one or more unique or nearly unique common features; features of substantial but lesser distinctiveness may yield a distinctive combination when considered together. [Citation.]" (*People v. Miller* (1990) 50 Cal.3d 954, 987.)

While many of the shared characteristics individually are generic in nature, the court could reasonably find that the totality of the similar characteristics or common marks was sufficient to admit evidence of the uncharged Orange County robbery under Evidence Code section 1101, subdivision (b). Those similarities included: The robbers

worked in pairs—one acting as a lookout while the other stole the jewels; they robbed jewelry stores; they took only high-end jewels; they used obscured cars—one was a rental and the other had paper license plates; they parked their getaway car in a manner and location to allow a quick escape; they used a weapon; they wore hats, dark sunglasses, and hooded sweatshirts; they used a large duffel bag; the robberies occurred during business hours; and the robbers entered and exited the premises through the front door.

Although defendant contends these similarities are common of the crime, the similarities, viewed in the aggregate, are significant because of their number. (*People v. Miller*, *supra*, 50 Cal.3d at p. 988.) Taken together, the common marks logically operate to set defendant's robberies apart from other crimes of the same general variety and, in so doing, tend to strongly suggest that defendant was a perpetrator of both robberies. (*Id.* at p. 989.)

Defendant argues the dissimilarities were "numerous and distinctive." Such dissimilarities included: the robberies occurred in different counties; the vehicle used in the Orange County robbery was a distinctive blue while the car used in the Temecula robbery was a common gray Honda with paper dealership plates; the style of the robberies was different—a stick-up versus a smash and grab; the weapons used was different—a sledgehammer versus a gun; defendant acted as a lookout in the Orange County robbery; and the victims were threatened in the Orange County robbery.

While the prior and charged offenses were dissimilar in some ways, a reasonable court nevertheless could conclude the totality of similar common marks was sufficient to admit the evidence under Evidence Code section 1101, subdivision (b).

Defendant also claims that even if the prior offense is admissible under section Evidence Code section 1101, the court should have excluded it as being unduly prejudicial under Evidence Code section 352. "[O]ther-crimes evidence must be excluded if its probative value is outweighed by its prejudicial effect (Evid. Code, § 352), or if the evidence is 'merely cumulative with respect to other evidence which the People may use to prove the same issue. . . .'" (*People v. Miller*, *supra*, 50 Cal.3d at p. 987, quoting *People v. Thompson* (1980) 27 Cal.3d 303, 318.)

Here, the trial court's finding that the probative value of evidence of the prior offense outweighed any prejudicial effects of the evidence was within the bounds of reason. The uncharged and charged robberies shared numerous common characteristics, which resulted in evidence of the prior crime being highly probative in establishing that defendant perpetrated the charged offenses. The probative value was also enhanced by the fact that investigation of the prior robbery was entirely separate and independent from the charged offense and, thus, the investigation was not influenced by knowledge of the charged offense. (*Ewoldt*, *supra*, 7 Cal.4th at p. 404.) In addition, testimony regarding the prior robbery was not unduly detailed or lengthy. Also, the prior offense, which occurred a few months before the charged offense, was not significantly more inflammatory than the charged crime.

Even if there was error in admitting evidence of the uncharged incident of robbery to prove identity, the error was not prejudicial. As a general rule, the erroneous admission of evidence is prejudicial only if it is reasonably probable that absent its admission defendant would have received a more favorable result. (*People v. Watson* (1956) 46 Cal.2d 818, 836.)

Defendant has failed to show a reasonable probability he would have received a more favorable result absent the uncharged crimes evidence. (*People v. Ochoa* (2001) 26 Cal.4th 398, 442.) The jury here was presented with substantial evidence to establish defendant's identity as the perpetrator of the Temecula robbery. OCSD investigators observed defendant casing several jewelry stores in the Southern California area with his accomplice just weeks after the Temecula robbery. While casing the jewelry stores, defendant drove a gray Honda Accord with paper Norm Reeves license plates—the vehicle matching the description of the getaway car from the Temecula robbery. When defendant was stopped in the gray Honda Accord vehicle with his accomplice on December 23, investigators found numerous items linking defendant to the Temecula robbery in the car. Officers found a sledgehammer, a dark duffel bag, jewelry trays from the Temecula jewelry store, gloves, sunglasses, and a diamond ring. Finally, Mr. McKay identified defendant as one of the two men he saw running from the Temecula Promenade Mall and getting into the gray Honda Accord with paper Norm Reeves license plates. Defendant's guilt was established even absent the uncharged crimes evidence; therefore, any error in admitting evidence of the Orange County robbery was harmless. (See *People v. Cavanaugh* (1955) 44 Cal.2d 252, 268-269.)

15

B.    *Sufficiency of the Evidence to Support the Weapon's Use Enhancement*

Defendant contends the evidence was insufficient to support the personal use of a deadly weapon allegation because he did not use or display the sledgehammer in a menacing manner.  Rather, he argues, the evidence supports only a finding that he used the sledgehammer as a tool to open the jewelry case, not as a weapon to threaten the store employees.

Under section 12022, subdivision (b)(1), "Any person who personally uses a deadly or dangerous weapon in the commission of a felony or attempted felony shall be punished by an additional and consecutive term of imprisonment in the state prison for one year, . . ."  "A defendant personally uses a dangerous or deadly weapon under section 12022, subdivision (b) when he 'displays such a weapon in an intentionally menacing manner' or intentionally strikes or hits a human being with it."  (*People v. Winslow* (1995) 40 Cal.App.4th 680, 686; see also *People v. Wims* (1995) 10 Cal.4th 293, 302, disapproved on other grounds in *People v. Sengpadychith* (2001) 26 Cal.4th 316, 325-326.)  In contrast, armed with a weapon has been defined as to knowingly carry or have a weapon available for offensive or defensive use.  (See § 1203.06, subd. (b)(3); *People v. Bland* (1995) 10 Cal.4th 991, 997.)

In comparing the terms "use" and "armed," the term "use" has been given a broad definition.  Indeed, our Supreme Court has explained that the "obvious legislative intent to deter the use of firearms [or weapons] in the commission of the specified felonies requires that 'uses' be broadly construed."  (*People v. Chambers* (1972) 7 Cal.3d 666, 672; see also *People v. Fierro* (1991) 1 Cal.4th 173, 225, disapproved on another ground

16

as stated in *People v. Letner & Tobin* (2010) 50 Cal.4th 99, 205-207.)[5] Thus, in defining

the term "use" the court has noted that "[a]lthough the use of a firearm connotes

something more than a bare potential for use, there need not be conduct which actually

produces harm but only conduct which produces a fear of harm or force by means or

display of a firearm in aiding the commission of one of the specified felonies."

(*Chambers*, at p. 672; see also *People v. Wims*, *supra*, 10 Cal.4th at p. 302 ["In order to

find 'true' a section 12022[, subdivision](b) allegation, a fact finder must conclude that,

during the crime or attempted crime, the defendant himself or herself intentionally

displayed in a menacing manner or struck someone with an instrument capable of

inflicting great bodily injury or death"].)

"'Use' means, among other things, 'to carry out a purpose or action by means of,'

to 'make instrumental to an end or process,' and to 'apply to advantage.'" (*People v.*

*Chambers*, *supra*, 7 Cal.3d at p. 672.) Therefore, if a defendant "deliberately shows" a

weapon "or otherwise makes its presence known, and there is no evidence to suggest any

purpose other than intimidating the victim (or others) so as to successfully complete the

underlying offense, the jury is entitled to find a facilitative use" supporting the

enhancement, "rather than an incidental or inadvertent exposure" that would not. (*People*

*v. Granado* (1996) 49 Cal.App.4th 317, 325 [the "failure to actually point the [weapon],

---

[5] The courts regularly refer to cases construing the "use" of a firearm sentencing enhancement when interpreting the substantially similar enhancement for "use" of a deadly or dangerous weapon. (See, e.g., *People v. James* (1989) 208 Cal.App.3d 1155, 1163 ["The weapon use provision of former section 12022, subdivision (b) is substantially similar to the firearm use provision of section 12022.5. Therefore, we rely on cases which construe the term 'use' in section 12022.5," fn. omitted].)

17

or to issue explicit threats of harm, does not entitle the defendant to a judicial exemption" from the statutory weapons use enhancement].)  It is not necessary that the display cause fear in the victim; the question is whether the defendant intended to facilitate the crime through his conduct.  (*Id*. at p. 328.)

Whether a defendant "used" a weapon in committing a crime is a question "for the trier of fact to decide."  (*People v. Masbruch* (1996) 13 Cal.4th 1001, 1007.)  We review such findings only to determine if they are supported by substantial evidence and, thus, "review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible and of solid value—from which a reasonable trier of fact could" make the challenged finding "beyond a reasonable doubt."  (*People v. Snow* (2003) 30 Cal.4th 43, 66; accord, *People v. Johnson* (1980) 26 Cal.3d 557, 578.)  We must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.  (*People v. Rayford* (1994) 9 Cal.4th 1, 23.)

There is no dispute here that a sledgehammer can constitute a deadly weapon.  (See *People v. Seaton* (2001) 26 Cal.4th 598; *People v. Simons* (1996) 42 Cal.App.4th 1100, 1106-1107.)  The key inquiry for the weapon use enhancement is whether defendant used the sledgehammer in some fashion to aid the commission of the robberies.  (See *People v. Fierro*, *supra*, 1 Cal.4th at p. 226; *People v. Granado*, *supra*, 49 Cal.App.4th at pp. 325, 330; *People v. Masbruch*, *supra*, 13 Cal.4th at p. 1012.)  In the instant case, substantial evidence supports the jury's finding that defendant used a weapon in committing the robberies.  When defendant entered the Temecula jewelry

store, he took out a sledgehammer and began pounding the tempered glass with it multiple times until the glass caved in. While defendant hammered the glass with the sledgehammer, his accomplice stood next to the two store employees who stood a few feet away and witnessed the incident, warning them not to move. One of the employees testified that she saw defendant take out a sledgehammer from his duffel bag and then saw him pounding on the tempered glass. Another employee testified that she heard defendant pounding at the jewelry case. Both employees stated that they feared for their safety. There was no evidence to suggest that defendant dropped the sledgehammer or abandoned it after he broke the glass on the jewelry case; presumably defendant continued to hold the sledgehammer as he fled the scene.[6] The jury could reasonably infer that defendant's actions of using the sledgehammer were a display of menacing power to facilitate the robberies. (See *People v. Masbruch*, *supra*, 13 Cal.4th at pp. 1006-1011 [jury could reasonably conclude that control and fear created by initial weapon display during theft continued through entire lengthy encounter even though defendant did not display the weapon during ensuing rape.)

---

[6] We note, for purposes of use enhancement, robbery and similar crimes "continue beyond the time of the physical conduct constituting the offense until the perpetrator has reached a place of temporary safety. Accordingly, one who employs a firearm [or weapon] at any time on the continuum between the initial step of the offense and arrival at a place of temporary safety is subject to the enhancement." (*People v. Taylor* (1995) 32 Cal.App.4th 578, 582.) Therefore, despite the fact that defendant and his accomplice had fled, the robbery continued until defendant fled and reached a place of temporary safety, and any weapon use within that period of time is subject to the enhancement. Indeed, defendant does not argue otherwise.

Defendant relies on *People v. Hays* (1983) 147 Cal.App.3d 534 to support his proposition that he simply used the sledgehammer as a tool to open the jewelry case, and not in an attempt to intimidate or frighten the victims. We find *Hays* distinguishable.

In *People v. Hays*, *supra*, 147 Cal.App.3d 534, the defendant, with a sawed-off rifle strapped to his body, crashed through the ceiling of a drugstore he intended to rob. (*Id*. at p. 539.) The gun was in full view of two store employees while the defendant committed the underlying crime. (*Ibid*.) However, there was no evidence the defendant ever handled the rifle, let alone "display[ed] it in a menacing manner." (*Id*. at p. 544.) The Hays court reviewed several opinions regarding the use of weapons and observed, "of the 14 cases finding use enhancement proper, 12 of them show the defendant aimed, cocked, or fired the weapon [in the presence of the victim]. The 13th . . . found a use enhancement where the gun was in the hands of the defendant while he verbally threatened the robbery victims. The 14th . . . did not involve touching the weapon but exposing it in a menacing fashion accompanied by words threatening a more violent use." (*Id*. at p. 548.) The appellate court struck the use enhancement because, unlike the defendants in the surveyed cases, the defendant in *Hays* only "passively displayed" the rifle, an act more akin to armed cases than use cases. (*Id*. at pp. 548-549.)

This principle was reiterated in *Alvarado v. Superior Court* (2007) 146 Cal.App.4th 993. In *Alvarado*, the defendant walked into a convenience store, commanded the clerk to call police, and stated he was on a suicide mission. After the clerk called police, he noticed a shotgun resting on a candy rack about one foot away from the defendant. (*Id*. at pp. 997-998.) The gun remained in that position until it was

20

retrieved by police after the defendant's arrest. As in *Hays*, there was no evidence of the defendant brandishing or displaying the shotgun in a menacing manner, nor did any victim or third party witness the defendant hold or pick up the shotgun or even draw attention to its presence. Relying on *Hays*, the court held that the record showed no gun-related conduct beyond passive exposure of the gun, circumstances under which a personal use of a firearm enhancement cannot stand. (*Id*. at p. 1005.)

Here, however, it was undisputed that defendant held the sledgehammer in his hand and used it to pound on the glass of the jewelry case while his accomplice stood in front of the two store employees, instructing them not to move and to place their hands in the air. "The holding in *Hays* reflects a principle under which a finding of weapon use is precluded if the defendant's conduct with respect to the weapon appears to be purely incidental to the crime. In *Hays* the evidence was insufficient because, even though the gun was exposed to the victim's view, the exposure was not an act in furtherance of the crime, but a mere incident of possession." (*People v. Granado*, *supra*, 49 Cal.App.4th at p. 324.)

As the court explained in *Granado*, the "litmus test" for determining whether a defendant "used" a weapon (or was merely "armed" with a weapon) "is functional: did the defendant take some *action* with the [weapon] *in furtherance of the commission* of the crime? If so the [weapon] was 'used,' . . . If, on the other hand, the defendant engaged in no weapons-related conduct, or such conduct was incidental and unrelated to the offense, no 'use' occurred." (*People v. Granado*, *supra*, 49 Cal.App.4th at p. 325, fn. 7.)

21

We agree with *Granado* and hold that the dividing line between "use" and "armed" is determined by whether the defendant's weapon-related conduct constitutes an act in furtherance of a crime or merely a passive and inadvertent exposure of the weapon. It is irrelevant whether the weapon-related conduct was directed at or witnessed by someone. This interpretation is in accord with our Supreme Court's mandate that the term "use" be broadly construed. (*People v. Chambers*, *supra*, 7 Cal.3d at p. 672.) Further, using this analysis, it is clear that the finding of simple arming in *Hays* and *Alvarado* resulted from the fact the defendants there simply did not engage in any weapon-related conduct. (*People v. Hays*, *supra*, 147 Cal.App.3d at pp. 544, 548-549; *Alvarado v. Superior Court*, *supra*, 146 Cal.App.4th at p. 1005.)

The facts of the present case are unlike *Hays* and *Alvarado*, where there was only a passive display of the weapon and no weapon-related conduct to speak of. All that is needed to uphold a use enhancement is substantial evidence that the defendant engaged in any weapon-related conduct with the intent to facilitate the commission of the underlying crime. Here, defendant pulled out a sledgehammer from his duffle bag, held it with his hands, and began pounding on the tempered glass with it while the two victims stood several feet away in fear for their safety. There is no evidence that defendant dropped the sledgehammer or abandoned the weapon once he broke the glass with it. Presumably, defendant continued to hold the sledgehammer until he reached a point of safety. Thus, defendant engaged in a weapon-related conduct while possessing the intent to facilitate commission of the underlying robberies; nothing more is needed for the weapon-use

22

enhancement to stand. From defendant's actions, the jury could reasonably infer that defendant in fact displayed the sledgehammer in a menacing manner.

The use enhancement statute was intended to deter a defendant from "bringing a gun [or weapon] 'into play'" during the commission of a felony because this increases the likelihood of violent injury, not only through "an intentional act by the victim or a third party, *but through an impulsive or inadvertent act by the defendant*." (*People v. Granado*, *supra*, 49 Cal.App.4th at p. 327, italics added.) The threat of an inadvertent or impulsive act by the defendant remains even where a weapon is also used as a tool to commit the offense. Defendant's actions here produced a fear of harm and aided in the commission of the robberies. "In light of the decision as a whole, . . . [i]t is more reasonably understood to mean that the conduct must be such as 'produces a fear of harm or force' on the part of a hypothetical, reasonable observer—such as a juror looking back at the event through the lens of the evidence at trial." (*Ibid.*) Consequently, we cannot disturb the jury's finding that, in committing the robberies, defendant used a dangerous or deadly weapon.

# III

# DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ
P. J.

We concur:

RICHLI
J.

KING
J.